Opinion by Judge GRABER; Concurrence by Judge W. FLETCHER; Dissent by Judge BYBEE; Dissent By Judge RYMER; Dissent By Judge KLEINFELD; Dissent by Judge KOZINSKI.
GRABER, Circuit Judge.
Plaintiff John Doe, a student who has no Hawaiian ancestry, applied for admission to Defendant Kamehameha Schools, a private, non-profit K-12 educational institution in Hawaii that receives no federal funds. He was denied entry. The Kamehameha Schools were created through a charitable testamentary trust, established by the last direct descendant of the Hawaiian monarchy, for the education and upbringing of Native Hawaiians. As a result, the Kamehameha Schools’ admissions policy gives preference to students of Hawaiian ancestry. Plaintiff argues that he was denied admission because of his race in violation of 42 U.S.C. § 1981.
The majority of a three-judge panel held that the Kamehameha Schools’ admissions policy, with its preference for Native Hawaiians, constituted unlawful race discrimination under 42 U.S.C. § 1981.[1] We took this case en banc to reconsider whether a Hawaiian private, non-profit K-12 school that receives no federal funds violates § 1981 by preferring Native Hawaiians in its admissions policy. We now answer “no” to that question and, accordingly, affirm the district court.
*830 FACTUAL AND PROCEDURAL BACKGROUND
A. Factual Background
1. Historical Context[2]
The islands of Hawaii are geographically isolated in the South Pacific Ocean and were originally settled sometime between 1 and 750 A.D. The Native Hawaiians developed a well-organized, efficient, and thriving civilization “based on a communal land tenure system with a sophisticated language, culture, and religion.” 20 U.S.C. § 7512. The land, abundant in natural resources, allowed the Native Hawaiians to thrive. Office of Hawaiian Affairs, Native Hawaiian Rights Handbook 3 (Melody Kapilialoha MacKenzie ed.1991) (hereinafter “Rights Handbook ”).
The first Western contact with the Hawaiian islands occurred in 1778 when Captain James Cook landed on the island of Kauai. The immediate result of that first encounter was that Native Hawaiians were introduced to Western goods and Western diseases. “By 1919, the Native Hawaiian population had declined from an estimated 1,000,000 in 1778 to an alarming 22,600.” 20 U.S.C. § 7512(7). But see Rice v. Cayetano, 528 U.S. 495, 500, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (estimating the population in 1778 as between 200,000 and 300,000).
In 1810, Kamehameha I created a unified monarchy over all the Hawaiian Islands, becoming the first King of Hawaii and affording the islands a level of cohesion and security that they had not previously known. The United States officially recognized the sovereignty of the Kingdom of Hawaii in 1826 and, from 1843 until 1893, extended full diplomatic recognition to the islands. Other countries, too — in-eluding Great Britain, France, and Japan- — recognized the Hawaiian Kingdom. 20 U.S.C. § 7512(1). Before 1893, the United States entered into a number of treaties for peace, friendship, and commerce with the Kingdom. U.S. Dep’t of Justice & U.S. Dep’t of the Interior, From Mauka to Makai: The River of Justice Must Flow Freely 1 (Oct. 23, 2000) (hereinafter “From Mauka to Makai”). The first treaty was signed in 1826, and additional treaties were signed in 1849, 1875, and 1887. See Rice, 528 U.S. at 504, 120 S.Ct. 1044 (discussing the history of diplomatic relations between the United States and the Kingdom of Hawaii before the overthrow of the monarchy).
The Kingdom of Hawaii, located along shipping and fishing routes, was commercially desirable. Initially, trade with the Kingdom of Hawaii revolved around the islands’ fur and sandalwood resources, as well as the whaling industry. Rights Handbook at 5. When over-harvesting destroyed the sandal-wood trade and depleted the whaling stocks, wealthy Westerners turned to large-scale plantations, primarily growing sugar, to make money. Id. As foreign investment became more and more tied to land ownership, demand for change in the traditional land tenure system, which did not provide for individual land titles, intensified. Id. at 6. Pressure from Westerners eventually led the Hawaiian government to reject the land tenure system in favor of privatized land ownership, which allowed Westerners “[w]ith a permanent population of fewer than two thousand” to take “over most of Hawaii’s land in the next half-century and manipulate[] the economy for their own profit.” Neil M. Levy, Native Hawaiian Land Rights, 63 Cal. L.Rev. 848, 857-58 (1975) (footnote omitted).
*831 Western economic domination of the Hawaiian Islands was followed by an interest in establishing political control. Id. at 861. “In 1893, the sovereign, independent, internationally recognized, and indigenous government of Hawaii, the Kingdom of Hawaii, was overthrown by a small group of non-Hawaiians, including United States citizens, who were assisted in their efforts by the United States Minister, a United States naval representative, and armed naval forces of the United States.” 20 U.S.C. § 7512(5). The United States annexed Hawaii not long thereafter. Id. § 7512(6). Laws were then enacted suppressing the Hawaiian culture and language and allowing for the displacement of Native Hawaiians from their lands. From 1896 to 1986, almost a full century, the Hawaiian language was banned as a medium of instruction in schools. Id. § 7512(19). Hula, a Native Hawaiian dance form, and local healing practices also had been banned during the westernization of the islands. Such measures resulted in “mortality, disease, economic deprivation, social distress and population decline.” From Mauka to Makai at 1.
Hawaii finally attained statehood in 1959. Rights Handbook at 18. More than 30 years later, in recognition of the United States’ role in the overthrow of the independent Hawaiian monarchy, Congress officially apologized to the Hawaiian people and expressed its commitment to “provide a proper foundation for reconciliation between the United States and the Native Hawaiian people.” 1993 Apology Resolution, Pub.L. No. 103-150, 107 Stat. 1510, 1513 (1993).
2. The Kamehameha Schools
The Kamehameha Schools were created under a “charitable testamentary trust established by the last direct descendent of King Kamehameha I, Princess Bernice Pauahi Bishop, who left her property in trust for a school dedicated to the education and upbringing of Native Hawaiians.” Burgert v. Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir.2000). Princess Bernice Pauahi Bishop’s will provided for the erection and maintenance of schools in the Hawaiian Islands, called the Kamehameha Schools, on the Hawaiian monarchy’s ancestral lands, with the purpose of providing “a good education in the common English branches, and also instruction in morals and in such useful knowledge as may tend to make good and industrious men and women.” Will of Bernice Pauahi Bishop, reprinted in Wills and Deeds of Trust 17-18 (3d ed.1957) (hereinafter “Pauahi Bishop Will”). The Pauahi Bishop Will also bestowed on the “trustees full power to make all such rules and regulations as they may deem necessary for the government of said schools and to regulate the admission of pupils.” Id. at 18.
Under the direction of the original trustees, chaired by Pauahi Bishop’s widower, Charles Reed Bishop, the Kamehameha Schools opened in the late nineteenth century.[3] During a speech on the Schools’ first Founder’s Day, in December 1888, Charles Reed Bishop stated that Princess Bernice Pauahi Bishop had created the Kamehameha Schools, “in which Hawaiians have the preference,” so that “her own people” could once again thrive. Charles R. Bishop, The Purpose of the Schools, Handicraft, Jan. 1889, at 3.
In 1910, not long after the death of Princess Bernice Pauahi Bishop and the *832 creation of the Kamehameha Schools, the question arose as to who should be admitted to the Schools. Cobey Black & Kathleen Mellen, Princess Pauahi Bishop and Her Legacy 155 (The Kamehameha Schools Press 1965). Charles Bishop wrote to the trustees: “Mrs. Bishop intended that, in the advantages of her beneficence, those of her race should have preference.” Id. Accordingly, he concluded that the principal of the Schools was justified in refusing to admit a student who had no native Hawaiian ancestry. Id. Bishop went on to convey that only if Native Hawaiians failed to apply to the Schools, or if conditions changed fundamentally, should admissions be opened to other eth-nicities: “It was wise to prepare for and to admit natives only and I do not think the time has come to depart from that rule.” Id.
Today, the Kamehameha Schools operate three K-12 campuses: Kapalama on the island of Oahu, Pukalani on the island of Maui, and Keaau on the island of Hawaii. There are about 70,000 school-aged children in Hawaii who meet the Schools’ definition of Native Hawaiian, but the Schools’ total enrollment is only about 4,856 students. The Kamehameha Schools subsidize much of the tuition cost for all students, requiring payment of only $1,784 per year, whereas the cost of educating a student amounts to about $20,000 annually. Sixty-five percent of those enrolled receive some form of financial aid to help them pay even that heavily subsidized, modest tuition.
Part of the Kamehameha Schools’ stated admissions policy is to give preference to students of Native Hawaiian ancestry, defined to include any person descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778. Practically, the policy operates to admit students without any Hawaiian ancestry only after all qualified applicants with such ancestry have been admitted. Because there are many more qualified students of Hawaiian ancestry than there are available places at the Schools, it is very rare that a student with no Hawaiian ancestry is admitted to the campus programs. But the admissions policy is not an absolute bar to non-Native Hawaiians; instead, it is intended to last only for so long as Native Hawaiians suffer educational disadvantages.
We pause to note that the Schools’ policy contains no requirement for a minimum blood quantum of Hawaiian ancestry. The only requirement is that a student have at least one Native Hawaiian ancestor. Most students have mixed ancestry. More than 60 different racial and ethnic groups have been represented in the student body, and for the 2000-2001 academic year, students reported belonging to 39 different racial and ethnic groups. Accordingly, an observer visiting the Schools would see visible diversity notwithstanding the students’ commonality of having at least one Native Hawaiian ancestor.
The Kamehameha Schools follow a “Leadership Model” of education. This curriculum is meant to foster the self-esteem and self-identity of students as individuals of Native Hawaiian descent by teaching Native Hawaiian culture, heritage, language, and tradition, in addition to general college-preparatory courses.
Kamehameha Schools also operate a number of other educational programs, including pre-schools, enrichment programs, and summer school programs. In those programs, the admission of non-Native Hawaiians occurs more often. For example, for the 2001-2002 school year, 13 children with no Native Hawaiian ancestry were admitted to Kamehameha’s preschool program (two of the children declined admission); the following school year 12 non-Native Hawaiian children *833 were admitted to the pre-school; and the year after that — the 2003-2004 school year — 16 students without Native Hawaiian ancestry were admitted. And, in the summer of 2003, for instance, non-Native Hawaiians were enrolled in several of the enrichment programs run by the Kamehameha Schools: 6 of 133 students in the Performing Arts Academy; 33 of 1,741 students in Explorations; 5 of 18 students in Culinary Arts; and 4 of 164 students in Hoolauna Keauhou.
3. Current Conditions in the Edti-cational Status of - Native Haivai-ians
Although the Kamehameha Schools are partly responsible for the Native Hawaiian community’s ability to maintain “its distinct character as an aboriginal, native people,” Native Hawaiians, nonetheless, continue to face “economic deprivation, low educational attainment, poor health status, substandard housing and social dislocation.” From Mauka to Makai at 2. In particular, Native Hawaiians have traditionally performed much below national averages in the educational arena.
In 1981, Congress instructed the Office of Education to submit to Congress a comprehensive report on Native Hawaiian education. The report, entitled the “Native Hawaiian Educational Assessment Project,” was released in 1983 and documented that Native Hawaiians scored below parity with regard to national norms on standardized achievement tests, were disproportionately represented in many negative social and physical statistics indicative of special educational needs, and had educational needs that were related to their unique cultural situation, such as different learning styles and low self-image.
20 U.S.C. § 7512(14).
That trend continues today. In 2002, Congress recognized that Native Hawaiians are severely disadvantaged in education. It found that:
(A) educational risk factors continue to start even before birth from many Native Hawaiian children[;]
(B) Native Hawaiian students continue to begin their school experience lagging behind other students in terms of readiness factors such as vocabulary test scores;
(C) Native Hawaiian students continue to score below national norms on standardized education achievement tests at all grade levels;
(D) both public and private schools continue to show a pattern of lower percentages of Native Hawaiian students in the uppermost achievement levels and in gifted and talented programs;
(E) Native Hawaiian students continue to be over-represented among students qualifying for special education programs provided to students with learning disabilities, mild mental retardation, emotional impairment, and other such disabilities;
(F) Native Hawaiians continue to be underrepresented in institutions of higher education and among adults who have completed four or more years of college;
(G) Native Hawaiians continue to be disproportionately represented in many negative social and physical statistics indicative of special educational needs[;]
... and
(H) Native Hawaiians now comprise over 23 percent of the students served by the State of Hawaii Department of Education, and there are and will contin *834 ue to be geographically rural, isolated areas with a high Native Hawaiian population density.
20 U.S.C. § 7512(16)(A)-(H).
In addition, the most recent Native Hawaiian Educational Assessment, published in September 2005, concluded that, “[o]n the whole, ... Native Hawaiian children in the public school system perform poorly in school compared with their non-Hawaiian peers.” Ka Huakai, 2005 Native Hawaiian Educational Assessment 229, available at http://ulukau.org/ elib/cgi-bin/li-brary?c=nhea & l=en (hereinafter “Ka Huakai”). That most recent report found that 75% of public schools with a predominantly Native Hawaiian student body did not meet the state’s adequate yearly progress standards, but that number dropped to less than 58% for schools without a majority of Native Hawaiians, a difference of more than 17%. Id. at 251. Also, Native Hawaiian students in elementary and secondary public schools ranked the lowest of all major ethnic groups throughout the state in reading and math, falling between 9 and 15 percentiles behind the state average. Id. at 261, 268. In addition, only 69.4% of Native Hawaiian students graduated from high school in 2002, compared to a state average of 76.6% overall. Id. at 285.[4]
B. Procedural History
Plaintiff applied for admission to the Kamehameha Schools. He has no Hawaiian ancestry. Although the school deemed him a “competitive applicant” and put him on the waiting list, he was repeatedly denied admission. The Kamehameha Schools concede that Plaintiff likely would have been admitted had he possessed Hawaiian ancestry.
Plaintiff filed an action under 42 U.S.C. § 1981, challenging the Kamehameha Schools’ admissions policy. He sought both damages and injunctive relief.[5] The district court granted summary judgment in favor of the Kamehameha Schools, holding that the policy satisfied a variation of the standard used to evaluate affirmative action plans challenged under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000h-6:
The Court finds the plan has a legitimate justification and serves a legitimate remedial purpose by addressing the socioeconomic and educational disadvantages facing Native Hawaiians, producing Native Hawaiian leadership for community involvement, and revitalizing Native Hawaiian culture, thereby remedying current manifest imbalances resulting from the influx of western civilization.
*835 Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, 295 F.Supp.2d 1141, 1172 (D.Haw.2003). The district court also held that application of § 1981 to the admissions policy should be consistent with other congressional enactments involving Native Hawaiians. Id. at 1174. Plaintiff timely appealed.
The majority of a three-judge panel reversed the district court. Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, 416 F.3d 1025, 1048 (9th Cir.2005). The panel concluded that the Title VII framework applied, id. at 1038-39, but the majority held that the Kamehameha Schools’ preference policy violated § 1981 because it “operates as an absolute bar to admission for non-Hawaiians,” id. at 1041. We then took the case en banc.[6] Doe v. Kamehameha Schools/Brnice Pauahi Bishop Estate, 441 F.3d 1029 (9th Cir.2006).
STANDARD OF REVIEW
The parties, and we, agree that we review de novo a grant of summary judgment. United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003). But the parties dispute vigorously what standard we should use to analyze the validity of the Kamehameha Schools’ admissions policy.
Plaintiff argues that the Schools’ policy should be evaluated under the “strict scrutiny” standard that applies to governmental action involving race-based preferences. The Schools counter that we should employ the more deferential Title VII test for evaluating affirmative action plans, with variations appropriate to the educational context. For the reasons that we detail below, we agree with the Schools.
DISCUSSION
A. History of § 1981, Runyon, and McDonald
Title 42 U.S.C. § 1981 provides, in pertinent part, that “[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens.” The genesis of the current statute was the Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (hereinafter “1866 Act”), which Congress enacted pursuant to the Thirteenth Amendment.[7] Un- *836 dor its authority to enact laws to abolish the “badges and incidents of slavery,” United States v. Stanley (Civil Rights Cases), 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835 (1883), Congress intended for the 1866 Act to counter the explicit discrimination faced by the recently freed slaves. See Gen. Bldg. Contractors Ass’n v. Pennsylvania, 458 U.S. 375, 386-88, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (“Congress instead acted to protect the freedmen from intentional discrimination by those whose object was to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices.” (internal quotation marks omitted)).
After the passage of the Fourteenth Amendment, Congress reenacted, with minor changes, the text of the 1866 Act in section 16 of the Enforcement Act of 1870, ch. 114, § 16, 16 Stat. 140 (hereinafter “1870 Act”).[8] See Runyon v. McCrary, 427 U.S. 160, 169 n. 8, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (describing the history of § 1981 and noting that section 16 of the 1870 Act was “merely a re-enactment,” with some small changes, of the 1866 Act). Accordingly, § 1981 has “roots” in both the Thirteenth and the Fourteenth Amendments. Gen. Bldg. Contractors, 458 U.S. at 390 n. 17, 102 S.Ct. 3141. But the “events and passions of the time in which the law was forged” make clear that the purpose of § 1981 was to destroy the societal influences that were intended to keep former slaves from achieving parity with former masters. Id. at 386, 102 S.Ct. 3141 (internal quotation marks omitted).
Section 1981 largely lay dormant for nearly a century when, in 1976, the Supreme Court reinvigorated the statute in Runyon. In Runyon, the Supreme Court faced the question whether § 1981 prevents “private, commercially operated, nonsectarian schools from denying admission to prospective students because they are Negroes,” 427 U.S. at 168, 96 S.Ct. 2586, and held that it does, id. at 172-73, 96 S.Ct. 2586.[9] The parents of African- *837 American children had sought to enter into contractual relationships with the schools. “Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments.” Id. at 172, 96 S.Ct. 2586. The schools’ refusal to admit them therefore “amount[ed] to a classic violation of § 1981.” Id. The Court noted that Congress had the right to reach private acts of discrimination in the private school setting because of its power under the Thirteenth Amendment to enact legislation to combat racial discrimination. Id. at 170-71. Runyon, then, involved a straightforward case of discrimination, not a remedial policy.
On the same day as it issued Runyon, the Court decided that § 1981, notwithstanding its text, prohibits discrimination against white people, as well as against non-whites. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 296, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).
In neither case did the Court have occasion to consider whether and under what terms (i.e., under what standard of scrutiny) a private remedial racial preference would be permissible in the educational context under § 1981, nor has it since. But in considering the reach of § 1981, the Supreme Court has looked, in different ways, to both the Fourteenth Amendment and Title VII for guidance.
B. Application of Title VII Standards to § 1981 Claims
In General Building Contractors, the Court limited § 1981 to cover only acts involving intentional discrimination, excluding from the statute’s reach actions that merely have a disparate effect. 458 U.S. at 391, 102 S.Ct. 3141. In so doing, the Court relied on the fact that § 1981 traces its history, in part, to the Fourteenth Amendment and, accordingly, to the Equal Protection Clause. Id. at 390-91, 102 S.Ct. 3141. Even though the Supreme Court imported the purposeful discrimination element of its equal protection jurisprudence to § 1981, later Supreme Court precedent regarding § 1981 and Title VII suggests that the “strict scrutiny” standard of equal protection does not apply to a wholly private school’s race-based remedial admissions plan.
In Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), superseded by statute on other grounds as stated in Estate of Reynolds v. Martin, 985 F.2d 470, 475 n. 2 (9th Cir.1993), the Supreme Court signaled its intention to apply the Title VII analysis to § 1981 claims brought against a private employer. In Patterson, the plaintiff brought a § 1981 suit against her former employer, alleging that the employer had harassed her, failed to promote her, and fired her on account of her race. 491 U.S. at 169, 109 S.Ct. 2363. The Court analyzed the ways in which § 1981 and Title VII overlap, as well as the statutes’ differences, and concluded that the Title VII burden-shifting system of proof established in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applied to the case at hand. Patterson, 491 U.S. at 186, 109 S.Ct. 2363. That is, the plaintiff first must establish a prima facie case of discrimination by coming forward with evidence that an employer considered race in its employment deci *838 sions. Id.; Johnson v. Transp. Agency, 480 U.S. 616, 626, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). After a prima facie case is established, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the decision. Patterson, 491 U.S. at 187, 109 S.Ct. 2363. “The existence of an affirmative action plan provides such a rationale.” Johnson, 480 U.S. at 626, 107 S.Ct. 1442. If a relevant affirmative action plan exists, then the burden shifts back to the plaintiff to show that the justification provided was pretextual and that the plan is invalid. Id.
Several courts expressly have applied Title VII’s substantive standards when examining § 1981 challenges to private affirmative action plans. The leading case, on which all the others rely, is Setser v. Novack Investment Co., 657 F.2d 962 (8th Cir.1981) (en banc). In Setser, the plaintiff, a white man, sued Novack under § 1981 claiming that he had been refused employment on account of his race because of an affirmative action plan. Setser v. Novack Inv. Co., 638 F.2d 1137, 1139 & n. 3 (8th Cir.1981), opinion vacated in part on reh’g by Setser, 657 F.2d at 962. The Setser court addressed two issues that are relevant here: “(1) whether section 1981 prohibits all race-conscious affirmative action; [and] (2) whether the standards for reviewing affirmative action under [T]itle VII govern the review of such plans under section 1981.” 657 F.2d at 965.
The Eighth Circuit first concluded that § 1981 does not bar affirmative action programs, even in light of McDonald, 427 U.S. at 296, 96 S.Ct. 2574, which held that § 1981 affords protection to white people. In so holding, the Setser court looked to the Supreme Court’s decision in United Steelworkers of Am. v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), which held that Title VII does not bar all preferential treatment on the basis of race, and applied the same rationale to § 1981:
It would indeed be ... ironic if the Civil Rights Act of 1866 was used now to prohibit the only effective remedy for past discriminatory employment practices against blacks and other minorities, when the Act was virtually useless to prevent the occurrence of such discrimination for more than a century.... We conclude that the Supreme Court, by approving race-conscious affirmative action by employers in Weber, implicitly approved the use of race-conscious plans to remedy past discrimination under section 1981. To open the door for such plans under [T]itle VII and close it under section 1981 would make little sense. The prohibition under section 1981 of affirmative action plans permissible under [Tjitle VII would bar a remedy Congress left within the discretion of private employers when it passed [T]itle VII.
Setser, 657 F.2d at 966-67 (emphasis added).
Having determined that affirmative action plans were permissible, the Setser court expressly “equat[ed] the affirmative action standards of [Tjitle VII with those of section 1981.” Id. at 967. The court did so in view of the general principle that, “[i]n fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under [Tjitle VII for direction.” Id. (internal quotation marks omitted). This principle of consistency was especially important to the Setser court because it found untenable the prospect that an employer could be ordered, under Title VII, to implement an affirmative action plan, but simultaneously barred from implementing that same plan under § 1981, if the two statutes were interpreted differently. Id. at 967-68.
*839 The Third Circuit in a recent decision, as well as other courts, have followed Setser in using Title VII standards to evaluate private affirmative action plans challenged under § 1981. See, e.g., Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498-99 (3d Cir.1999); Edmonson v. U.S. Steel Corp., 659 F.2d 582, 584 (5th Cir.1981) (per curiam); Frost v. Chrysler Motor Corp., 826 F.Supp. 1290, 1294 (W.D.Okla.1993); Stock v. Universal Foods Corp., 817 F.Supp. 1300, 1306 (D.Md.1993); see also Johnson v. Transp. Agency, 770 F.2d 752, 755 n. 2 (9th Cir.1985) (noting, with approval, the Setser analysis), aff'd, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987).
The Supreme Court’s recent University of Michigan cases — Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), and Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) — do not counsel a different result. In those cases, the Supreme Court strictly scrutinized the admissions policies of a public university, the University of Michigan Law School and its undergraduate counterpart. See Grutter, 539 U.S. at 326, 123 S.Ct. 2325 (law school); Gratz, 539 U.S. at 270, 123 S.Ct. 2411 (undergraduate institution). Plaintiff places great stock in the fact that in both cases, the Supreme Court mentioned § 1981 in conjunction with the plaintiffs Equal Protection Clause claim. See Grutter, 539 U.S. at 343, 123 S.Ct. 2325 (noting that, because the law school’s admissions policy satisfied strict scrutiny review under the Equal Protection Clause, it also satisfied § 1981); Gratz, 539 U.S. at 275-76 & n. 23, 123 S.Ct. 2411 (noting that, because the university’s undergraduate admissions program failed strict scrutiny under the Equal Protection Clause, it also violated § 1981).
To support both of its holdings, the Court cited General Building Contractors for the proposition that discrimination that violates the Equal Protection Clause also violates § 1981. See Grutter, 539 U.S. at 343, 123 S.Ct. 2325 (noting that “the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause”); Gratz, 539 U.S. at 276 n. 23, 123 S.Ct. 2411 (“[Pjurposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981.”). As explained earlier, in General Building Contractors, the Court held that § 1981, like the Equal Protection Clause, prohibits only purposeful discrimination and therefore does not permit claims of disparate impact. 458 U.S. at 389, 102 S.Ct. 3141. Read in context, we believe that the Supreme Court’s citation to General Building Contractors in the University of Michigan cases was meant to signal only the fact that both § 1981 and the Fourteenth Amendment require intentional discrimination. Whether strict scrutiny applies to § 1981 claims was not at issue. In Grutter and Gratz, cases involving state action, the schools perforce did not argue that their programs satisfied § 1981. The Court in Grutter and Gratz simply did not consider the question.
In view of the precedents that we have just discussed, we conclude that Title VII principles apply here. Defendant is a purely private entity that receives no federal funds. The Supreme Court has never applied strict scrutiny to the actions of a purely private entity. The question remains how best to adapt the Title VII employment framework to an educational context and to the unique historical circumstances of this case.
C. Applying a Modified Title VII Standard in the Educational Context Under § 1981
Only step three of the traditional three-stage Title VII analysis, Patterson, 491 U.S. at 187, 109 S.Ct. 2363; Johnson, *840 480 U.S. at 626, 107 S.Ct. 1442, is at issue here. At step one, Plaintiff established a prima facie case by showing (as the Schools concede) that the Kamehameha Schools consider applicants’ Hawaiian ancestry, or lack thereof, in making admissions decisions. At step two, the Kamehameha Schools have specified their remedial admissions policy as the non-discriminatory rationale for their decisions. See Johnson, 480 U.S. at 626, 107 S.Ct. 1442 (holding that an affirmative action plan provides a legitimate reason for a hiring decision that considers race or ethnicity). The validity of this policy is the focus of the parties’ attentions in this case. That is, at step three, Plaintiff asserts that the Schools’ “justification is pretextual and the [admissions] plan is invalid.” Id. The burden of proof at this step lies with Plaintiff. Id. at 627, 107 S.Ct. 1442.
The Supreme Court has outlined the appropriate step-three Title VII inquiry in the context of private employment. In Weber, the Court held for the first time that Title VII does not prevent private employers from implementing voluntary, remedial affirmative action plans. 443 U.S. at 208, 99 S.Ct. 2721. Weber involved an employer that had established a training program and reserved 50% of the program’s openings for black employees until the percentage of black workers in its plant reached the percentage of black workers in the local labor force. Id. at 197, 99 S.Ct. 2721. In concluding that the plan was permissible under Title VII, the Court noted that the plan did not “unnecessarily trammel the interests of the white employees” or “create an absolute bar to thefir] advancement.” Id. at 208, 99 S.Ct. 2721. The Court based its decision in part on the fact that the plan was a “temporary measure”: “Preferential selection ... will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the percentage of blacks in the local labor force.” Id. at 208-09, 99 S.Ct. 2721. The Court declined to “define in detail the line of demarcation between permissible and impermissible affirmative action plans.” Id. at 208, 99 S.Ct. 2721; see also Johnson, 770 F.2d at 757 (noting that the Supreme Court had not “establish[ed] a rigid formula for testing the validity of an affirmative action plan”), aff'd, 480 U.S. at 641, 107 S.Ct. 1442.
Eight years later, in Johnson, the Court concluded that a county-agency employer did not violate Title VII by taking into cpnsideration the sex of a female employee id deciding to promote her instead of a male employee. The promotional policy, which took into consideration the sex and race of an applicant, was valid because it attempted to eliminate a “manifest imbalance” in a “traditionally segregated job category].” Johnson, 480 U.S. at 631, 107 S.Ct. 1442 (internal quotation marks omitted). Like Weber, Johnson also considered whether the plan unnecessarily trammeled the rights of the non-preferred class, in this case men, or created an absolute bar to their advancement. Id. at 637-38, 107 S.Ct. 1442. Finally, the Court considered whether the plan was “temporary,” designed to “attain a balanced work force, not to maintain one.” Id. at 639-40, 107 S.Ct. 1442.
We recently distilled the Court’s analysis this way: private employers’ affirmative action plans (1) must respond to a manifest imbalance in the work force; (2) must not “unnecessarily trammel[]” the rights of members of the non-preferred class or “create an absolute bar to their advancement”; and (3) must do no more than is necessary to attain a balance. Rudebusch v. Hughes, 313 F.3d 506, 520-21 (9th Cir.2002). In Rudebusch, we found that the pay equity plan at issue was “not wholly analogous” to the hiring and pro *841 motional plans at issue in Weber and Johnson because of “some significant conceptual differences” between the types of plans. Id. at 520. We nevertheless applied the three Johnson factors, taking account of “the context of our case.” Id. at 521. Similarly, we hold today that the Johnson factors, modified to fit “the context of our case,” provide the appropriate framework for determining whether a wholly private K-12 educational institution’s remedial admissions policy is valid.
We note that, when assessing the validity of affirmative action plans, the Supreme Court has consistently recognized the importance of deferring to the judgment and expertise of the relevant decisionmakers. See Grutter, 539 U.S. at 328, 123 S.Ct. 2325 (deferring to education officials in admissions decisions); Weber, 443 U.S. at 206, 99 S.Ct. 2721 (giving deference to employers in hiring decisions). In the employment context, the Supreme Court held that, in enacting Title VII, Congress wished to preserve, to the maximum extent possible, the freedom and discretion traditionally afforded to private businesses. Weber, 443 U.S. at 206-07, 99 S.Ct. 2721. In the educational context, the Court has underscored that “complex educational judgments” should be left largely to schools. Grutter, 539 U.S. at 328, 123 S.Ct. 2325; see also Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 226 n. 12, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (noting that “[ajcademic freedom thrives ... on autonomous decisionmaking by the academy itself’ (citations omitted)). The importance of “educational autonomy” — at least in the post-secondary environment— is rooted in the First Amendment. See Grutter, 539 U.S. at 329, 123 S.Ct. 2325 (“[Gjiven ... the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition.”); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 312, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.) (“Academic freedom ... long has been viewed as a special concern of the First Amendment.”). Consequently, we must accord deference to private educational de-cisionmakers just as we do to private business decisionmakers and public educational decisionmakers.
More importantly, schools perform a significantly broader function than do employers. The Supreme Court has long recognized that schools do more than simply teach our Nation’s children the three “R’s.” Schools play a special role in the development of young citizens. See Grutter, 539 U.S. at 331, 123 S.Ct. 2325 (‘We have repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to sustaining our political and cultural heritage with a fundamental role in maintaining the fabric of society.” (internal quotation marks omitted)); Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (“[Education ... is the very foundation of good citizenship.”). Educational opportunity is crucial to the development of tomorrow’s leaders. See Grutter, 539 U.S. at 332, 123 S.Ct. 2325 (“In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity.”).
Primary and secondary school education is the gateway to higher education and is of paramount importance for the training of our nation’s workforce. See Plyler v. Doe, 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (“[Education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all.”); City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, *842 437, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (Blackmun, J., concurring) (“Our cases have consistently recognized the importance of education to the professional and personal development of the individual.”). Perhaps more relevant here, increased primary and secondary school educational achievement by minority groups can obviate the downstream need for affirmative action programs by employers and institutions of higher learning. See Johnson, 480 U.S. at 635, 107 S.Ct. 1442 (noting that very limited numbers of women and minorities possess the “specialized training and experience” required for many categories of jobs); Grutter, 539 U.S. at 346, 123 S.Ct. 2325 (Ginsburg, J., concurring) (noting that the need for affirmative action programs in higher education will decrease “[a]s lower school education in minority communities improves”).
In sum, schools educate students for their future endeavors in society as a whole. While private employers strive primarily to make money, and public employers (such as police and fire departments) perform a specific public function, schools pursue a much broader mission: the development of all children to become citizens, leaders, and workers.
The Title VII cases, in the employment context, recognize the laudable goal of achieving diversity and proportional representation in the workplace; this goal necessarily focuses internally and is limited to the “employer’s work force.” Johnson, 480 U.S. at 632, 107 S.Ct. 1442. By contrast, ensuring that significantly underachieving minority groups are included fully as tomorrow’s citizens, leaders, and workers necessarily focuses externally. Considering this important difference, we conclude that we should use a standard for evaluating remedial racial preferences by wholly private primary and secondary schools that is akin to that used in Title VII employment cases, but that takes into account the inherently broad and societal focus of the educational endeavor.
Adjusting the first Johnson factor to account for this external focus, we hold that, to justify a remedial racial preference, a private school must demonstrate that specific, significant imbalances in educational achievement presently affect the target population. The external focus of the educational mission renders unnecessary the requirement of proof of a “manifest imbalance” within a particular school; the relevant population is the community as a whole. At the same time, the strict focus on present, demonstrable disparities in educational achievement limits the types of permissible programs and distinguishes a more amorphous program that relies solely on general past societal discrimination. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505-06, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).
Relatedly, the second Johnson factor must be modified to account for the relevant scope of inquiry. Just as imbalance should be viewed in the relevant community, rather than in a single school, so should the respective rights of members of the non-preferred group. Therefore, within the community as a whole, an admissions policy must not “unnecessarily trammel” the rights of students in the non-preferred class or “create an absolute bar” to their advancement. The third Johnson factor is similarly modified: an admissions policy must do no more than is necessary to remedy the imbalance in the community as a whole, that we identified at the first step. These three factors best harmonize the relevant statutes and Supreme Court cases.
Judge Bybee’s reliance on Runyon in attacking our conclusion is particularly misplaced. As his dissent quotes several times, diss. at 857, 858, 860, the Supreme *843 Court in Runyon held that private primary schools in Virginia that categorically denied admission to African-American applicants represented a “classic violation of § 1981.” Runyon, 427 U.S. at 172, 96 S.Ct. 2586. Nothing in the modified Johnson framework that we adopt today, or indeed anywhere in this opinion, is to the contrary. Quite simply, Runyon is inap-posite: The program at issue in Runyon would certainly fail the first step of our analysis because specific, significant imbalances did not exist favoring African-Americans. To the contrary, specific, significant imbalances did exist disfavoring African-Americans. The Civil Rights Act was passed specifically with the plight of African-Americans in mind. It is therefore unsurprising that the Court labeled a whites-only admissions policy a “classic violation of § 1981.”
By contrast, the very nature of affirmative action plans is that historically disfavored and underachieving minorities may be given preferential treatment in certain narrowly defined, limited programs. It is the contours of such a program — a private school’s voluntary remedial admissions program — that we explore today. We turn now to applying the three modified Johnson factors to the Kamehameha Schools’ admissions policy.
1. Respond to a Manifest Imbalance
To meet the first modified Johnson factor, a private school must demonstrate that, in the relevant community, specific, significant imbalances in educational achievement presently affect the group favored by its admissions policy. The relevant community in this case is the state of Hawaii, because the Schools serve students from all of Hawaii’s islands. We therefore consider whether a manifest imbalance in current educational achievement exists between Native Hawaiians and other ethnic groups in Hawaii.
Native Hawaiian students are systemically disadvantaged in the classroom. As we described earlier, there is a substantial disparity in performance between Native Hawaiian students and other ethnic groups. Briefly, Native Hawaiian students score lower on standardized tests than all other ethnic groups in the state, Ka Huakai at 229, 261, are more likely to be in special education classes, id. at 278, are more likely to be absent from school, id. at 229, and are more likely to attend poor-quality schools, id. at 252. Native Hawaiians are the least likely of the state’s major ethnic groups to graduate from high school, id. at 229, 285, and they are less likely than their non-Hawaiian counterparts to attend college, id. at 118-19. Congress has expressly recognized the educational disadvantages suffered by Native Hawaiians and their marginalized status. 20 U.S.C. § 7512.
In view of those facts and congressional findings, it is clear that a manifest imbalance exists in the K-12 educational arena in the state of Hawaii, with Native Hawaiians falling at the bottom of the spectrum in almost all areas of educational progress and success.
Furthermore, it is precisely this manifest imbalance that the Kamehameha Schools’ admissions policy seeks to address. The goal is to bring Native Hawaiian students into educational parity with other ethnic groups in Hawaii. The stated purpose of Kamehameha Schools is to create educational opportunities to improve the capability and well-being of Native Hawaiians and to cultivate, nurture, and perpetuate Hawaiian culture, values, history, and language.
To that end, the Schools advance a curriculum specially tailored to students of Native Hawaiian descent. The Schools *844 have pinpointed areas in which Native Hawaiians, in particular, are severely disadvantaged and have developed a curriculum to attend to those needs. The Schools have instituted a “Leadership Model” of education, meant to “restore self-identity, integrate Native Hawaiian culture, heritage, language, and traditions into the educational process, and provide a first-rate educational experience for Native Hawaiians.” The Schools’ efforts are aimed at increasing scores on standardized tests, increasing the number of Native Hawaiians attending colleges and graduate schools, improving Native Hawaiian representation in professional, academic, and managerial positions, and developing community leaders who are committed to improving the lives of all Native Hawaiians.
In addition, the Kamehameha Schools recognized, early on, a critical need to help perpetuate Native Hawaiian culture. As a result, in the 1940s, the Schools instituted a formal Hawaiian Cultural Program that continues today. Courses on Hawaiian history and culture are required before a student may graduate.
The Kamehameha Schools have shown that specific, significant imbalances in educational achievement currently affect Native Hawaiians in Hawaii and that the Schools aim to remedy that imbalance. Accordingly, they have satisfied the “manifest imbalance” criterion.
2. Do Not Unnecessarily Trammel the Rights of Members of the Norr-Pre-ferred Class or Create an Absolute Bar to Their Advancement
Under the second prong of the modified Title VII analysis, we ask whether, within the relevant community of Hawaii, the Kamehameha Schools’ admissions policy unnecessarily trammels the rights of members of the non-preferred class, that is, students with no Hawaiian ancestry, or creates an absolute bar to their advancement.
The Kamehameha Schools allow all students to apply for admission. But once the applications are received, the Schools consider the ethnic background of the students and admit qualified children with Native Hawaiian ancestry before admitting children with no such ancestry. Because the pool of qualified potential students with Native Hawaiian blood greatly outnumbers the available slots at the Schools, non-Native Hawaiians generally are not admitted.[10] For the reasons that follow, however, the Schools’ admissions policy does not unnecessarily trammel the rights of non-Native Hawaiians or create an absolute bar to their advancement.
We begin by noting that nothing in the record suggests that educational opportunities in Hawaii are deficient for students, like Plaintiff, who lack any Native Hawaiian ancestry. To the contrary, the same statistical data that portray the difficulties of Native Hawaiian children generally portray much greater educational achievement, in both public and private primary and secondary schools, for children of all other racial and ethnic groups in Hawaii. Those students denied admission by Kamehameha Schools have ample and adequate alternative educational options. The well-documented ability of non-Native Hawaiians to attain educational achievement in Hawaii notwithstanding the Kamehameha Schools’ longstanding admissions policy demonstrates that the policy neither unnecessarily trammels the rights of non *845 Native Hawaiians nor absolutely bars their advancement in the relevant community.
Our inquiry does not stop there, however. The history of Native Hawaiians and of the Kamehameha Schools has certain unique features that Congress has acknowledged. In 1993, Congress admitted that the United States was responsible, in part, for the overthrow of the Hawaiian monarchy. 1993 Apology Resolution, 107 Stat. 1510. Later, when it enacted education-related legislation in 1994, and then reenacted that legislation in 2002, Congress made findings regarding the disadvantages faced by Native Hawaiian students in the public school system in Hawaii. 20 U.S.C. §§ 7901-7941, 7512(16). As part of the 2002 reenactment, a congressional committee even urged the Bishop Trust, which operates the Kamehameha Schools, to “redouble its efforts to educate Native Hawaiian children.” H.R.Rep. No. 107-63(1), at 333 (2001) (emphasis added).
Congressional recognition of the challenges faced by Native Hawaiians in the educational arena supports our conclusion that the Schools’ policy does not unnecessarily trammel the rights of non-Native Hawaiians. To the contrary, as Congress has recognized, in the unique context of Native Hawaiian history, affirmative measures are needed to address present, severe inequalities in educational achievement.
Finally, we examine the expectations of those who lack Native Hawaiian ancestry. The Supreme Court observed in Johnson that “the denial of the promotion[at issue] unsettled no legitimate, firmly rooted expectation on the part of petitioner.” 480 U.S. at 638, 107 S.Ct. 1442. Similarly, here, we must ask whether Plaintiff had a legitimate, firmly rooted expectation of admission to the Schools. The answer is “no.”
No applicant to the Kamehameha Schools is guaranteed admission. Just as the applicant in Johnson “had no absolute entitlement” to the promotion from his employer, Plaintiff here likewise “had no absolute entitlement” to admission to the Schools. Id.
Furthermore, the Kamehameha Schools were established when Hawaii was a sovereign nation, and they were built on the Hawaiian monarchy’s land. When the Schools began, a non-Native Hawaiian had no expectation of admission to the Schools, except when Native Hawaiians failed to fill all the available slots, or until Native Hawaiians achieved educational parity with others. See supra p. 832. In the intervening 118 years, the Schools’ admissions policy, and therefore the expectations of the non-Native Hawaiians, has remained constant. Thus, denial of Plaintiffs application for admission “unsettled no legitimate, firmly rooted expectation.” Johnson, 480 U.S. at 638, 107 S.Ct. 1442.
For the foregoing reasons, the Kamehameha Schools’ admissions policy does not unnecessarily trammel the rights of non-Native Hawaiians or create an absolute bar to their advancement.
3. Do No More than Is Necessary
Finally, the Schools’ admissions policy must do no more than is necessary to correct the manifest imbalance suffered by students of Native Hawaiian ancestry. This factor requires that an affirmative action plan be “temporary.” Johnson, 480 U.S. at 640, 107 S.Ct. 1442; Weber, 443 U.S. at 208, 99 S.Ct. 2721.
The Kamehameha Schools’ decision to give preference to students with Native Hawaiian ancestry is limited in duration in two distinct ways. First, if qualified students with Native Hawaiian ancestry do not apply to the Schools in sufficient numbers to fill the spots available, as happened *846 in one recent year, see supra note 10, the Schools’ policy is to open admissions to any qualified candidate. Second, preference will be given to students with Native Hawaiian ancestry only for so long as is necessary to remedy the current educational effects of past, private and government-sponsored discrimination and of social and economic deprivation. These dual aspects of the Kamehameha Schools’ policy constitute an “[e]xpress assurance that a program is only temporary.” Johnson, 480 U.S. at 639-40, 107 S.Ct. 1442. An explicit or immediately foreseeable end date has never been required for an affirmative action plan to be valid. See, e.g., id. at 639, 107 S.Ct. 1442 (finding the lack of an “explicit end date” “unsurprising” and upholding an employer’s affirmative action plan even though “only gradual” improvements were anticipated); see also Grutter, 539 U.S. at 343, 123 S.Ct. 2325 (adopting Justice Powell’s reasoning in the 25-year-old Bakke decision, which upheld affirmative action programs in higher education, and expecting that in 25 more years, these programs “will no longer be necessary” — a span of 50 years).
Because the admissions policy is not fixed, but changes as the capacity of the Schools’ programs increases and as the well-being of the Native Hawaiian community rises, the policy does no more than is necessary in light of the significant educational imbalances that Native Hawaiians continue to face.
Accordingly, the Kamehameha Schools’ admissions policy satisfies the three Johnson, criteria — offset a manifest imbalance, do not unnecessarily trammel others’ rights or create an absolute bar, and do no more than is necessary — as modified for the private primary and secondary school context. The Schools have shown that the admissions policy, favoring students of Native Hawaiian descent, is legitimate and valid.
Judge Bybee’s dissent contends that we should hew more closely to a traditional Title VII analysis and that, under such an analysis, the Schools’ preferential admissions policy is not valid. (Bybee, J., diss. at 857-85.) For the reasons that we have detailed, we believe that the dissent’s focus is too narrow for the private school context and that Kamehameha Schools’ remedial admissions policy is legitimate in the face of the serious and systemic disadvantages faced by Native Hawaiian students in Hawaii today. See Johnson, 480 U.S. at 640, 107 S.Ct. 1442 (“In evaluating the compliance of an affirmative action plan with Title VII’s prohibition on discrimination, we must be mindful of this Court’s and Congress’ consistent emphasis on the value of voluntary efforts to further the objectives of the law.” (internal quotation marks omitted)); see also Rudebusch, 313 F.3d at 522-24 (revising the third Johnson factor to analyze quantitative rather than temporal limitations because of the context).
Even if we were to try to shove a square peg into a round hole by strictly applying the test developed in employment cases to the Kamehameha Schools’ admissions policy, that policy would still be valid. As the Supreme Court has cautioned, “[i]t is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.” Weber, 443 U.S. at 201, 99 S.Ct. 2721 (internal quotation marks omitted). The Kamehameha Schools’ admissions policy holds true to the spirit of § 1981 by supporting Native Hawaiian students so that they may attain parity with their nonNative Hawaiian peers. See Gen. Bldg. Contractors, 458 U.S. at 386, 102 S.Ct. 3141.
*847 D. Alternatively, and in Addition, Congress Specifically Intended to Allow the Kamehameha Schools to Operate When, in 1991, It Re-enacted § 1981.
Plaintiff brought suit under § 1981. He has brought no constitutional claims. Thus, we are charged only with determining Congress’ intent.
Congress originally enacted what later became 42 U.S.C. § 1981 in 1870. At that time, the statute did not apply in Hawaii because it was an independent, sovereign kingdom. Congress could not have had any conscious intention as to how the statute would apply in Hawaii, because it did not apply at all. When Hawaii became a territory in 1898, § 1981 applied, as it continued to do when Hawaii became a state in 1959, see Hawaiian Statehood Act, Pub.L. No. 86-3, § 15, 73 Stat. 4.11 (1959), but it was not until 1991 that Congress again addressed and amended § 1981, see Civil Rights Act of 1991, Pub.L. No. 102-166, § 101, 105 Stat. 1071. The 1991 amendments are the most recent, and indeed the only, time since Hawaii became a territory that Congress has reenacted § 1981.
Therefore, we must determine what Congress intended, with regard to Native Hawaiians, when it reenacted § 1981 in 1991. Because “[w]e assume that Congress is aware of existing law when it passes legislation,” Miles v. Apex Marine Corp., 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), we must consider Congress’ long history of providing for Native Hawaiians through legislation. See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) (noting that courts “generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts”). By construing § 1981 in the context of past congressional action that recognizes and provides for Native Hawaiians, we preserve the “sense and purpose” of all relevant statutes. See Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (noting that it is the duty of the courts to give effect to differing and conflicting statutes so as to preserve their “sense and purpose”). Importantly, the Supreme Court has expressly considered contemporaneous legislation when interpreting the scope of § 1981. In Runyon, for instance, the Court relied on Congress’ enactment of the Civil Rights Act of 1964 and other civil rights legislation in concluding that Congress must have intended § 1981 to reach private acts of discrimination. 427 U.S. at 174, 96 S.Ct. 2586; see also Weber, 443 U.S. at 201, 99 S.Ct. 2721 (noting that the application of Title VII to remedial affirmative action plans must be read in light of its legislative history and “the historical context from which the Act arose”).
Accordingly, we look to legislation that Congress has passed specifically affecting Native Hawaiians both before and after 1991. As we have explained, we consider the pre-1991 statutory landscape because it informs us about what Congress had in mind when it reenacted § 1981. We consider the post-1991 statutes to the extent that they demonstrate Congress’ own understanding of § 1981. That is, we presume that Congress acts consistently with the extant body of law; statutes enacted after 1991, therefore, must be read consistently with the revised version of § 1981. See Cannon v. Univ. of Chi., 441 U.S. 677, 696-97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (concluding that elected officials are presumed to know the law, and that statutes should be read consistently with each other).
Beginning as early as 1920, Congress recognized that a special relationship exist *848 ed between the United States and Hawaii. See Hawaiian Homes Commission Act, 1920, 42 Stat. 108 (1921) (designating approximately 200,000 acres of ceded public lands to Native Hawaiians for homesteading). Over the years, Congress has reaffirmed the unique relationship that the United States has with Hawaii, as a result of the American involvement in the overthrow of the Hawaiian monarchy. See, e.g., 20 U.S.C. § 7512(12), (13) (Native Hawaiian Education Act, 2002); 42 U.S.C. § 11701(13), (14), (19), (20) (Native Hawaiian Health Care Act of 1988).
Congress has relied on the special relationship that the United States has with Native Hawaiians to provide specifically for their welfare in a number of different contexts. For example, in 1987, Congress amended the Native American Programs Act of 1974, Pub.L. No. 100-175, § 506, 101 Stat. 926 (1987), to provide federal funds for a state agency or “community-based Native Hawaiian organization” to “make loans to Native Hawaiian organizations and to individual Native Hawaiians for the purpose of promoting economic development in the state of Hawaii.” A year later, Congress enacted the Native Hawaiian Health Care Act of 1988, Pub.L. No. 100-579, § 11703(a), 102 Stat. 2916 (1988), “for the purpose of providing comprehensive health promotion and disease prevention services as well as primary health services to Native Hawaiians.”
Most importantly for our purposes today, Congress also has focused its attention on the educational disparities faced by Native Hawaiian students. In 1988, just three years before reenacting § 1981, Congress passed the Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988. 20 U.S.C. §§ 4901-4909 (1988) (repealed 1994) (hereinafter “Hawkins-Stafford Amendments”). Congress made extensive findings, similar to the findings that it later made in 2002, see supra pp. 833-34, about the educational needs of Native Hawaiians and recognized the necessity for “special efforts in education recognizing the unique cultural and historical circumstances of Native Hawaiians.” 20 U.S.C. § 4901(9) (1988) (repealed 1994). For instance, Congress concluded that it has the power to “specially legislate for the benefit of Native Hawaiians,” encouraged Native Hawaiians to play an active role in planning and managing Native Hawaiian educational programs, and noted that Native Hawaiians disproportionally fell below their peers in terms of educational achievement and progress. Id. § 4901(2) (1988) (repealed 1994). Congress then went on to affirm specifically the mission of Kamehameha Schools and the Schools’ model elementary curriculum, approving by name the Schools’ continued research and assessment activities. Id. § 4904(a) (1988) (repealed 1994). Similarly, Congress directed the Secretary of Education to make grants to the Schools “for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students.” Id. § 4905(a) (1988) (repealed 1994). The sole recipients of that assistance were to be “Native Hawaiians,” a term that was defined in the statute, as it is by Kamehameha Schools, as “a descendant of the aboriginal people, who prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii.”[11] Id. § 4909(1)(C) (1988) (repealed 1994).
The Hawkins-Stafford Amendments were repealed in 1994. 20 U.S.C. § 4901 *849 (1991) (repealed 1994). But for two reasons that fact does not alter the landscape of Native Hawaiian-oriented congressional enactments against which § 1981 must be read. First, when Congress reenacted § 1981 in 1991, the Hawkins-Stafford Amendments were still in effect. Second, Congress has continued thereafter to emphasize the need for special educational opportunities for Native Hawaiian students. (See Concurrence, p. 856.)
After reenacting § 1981, Congress passed the Native Hawaiian Education Act of 1994, 20 U.S.C. §§ 7901-7941, and then reenacted that statute in 2002, 20 U.S.C. §§ 7511-7517 (hereinafter “NHEA”). Like the Hawkins-Stafford Amendments, the NHEA recognized the special needs of Native Hawaiian students and the great disadvantages that they still face in Hawaii. Id. § 7512. As part of the No Child Left Behind Act of 2001, a congressional committee favorably mentioned the Bishop Trust and exhorted the Schools to “redouble [their] efforts” to provide for Native Hawaiians. H.R.Rep. No. 107-63(1), at 333.
These steadfast congressional policies favoring remedial measures for Native Hawaiians — and specifically remedial educational measures, some of them even mentioning the Schools and the Bishop Trust approvingly by name — inform our analysis of the validity of the Kamehameha Schools’ admissions policy under § 1981. It would be incongruous to conclude that while Congress was repeatedly enacting remedial measures aimed exclusively at Native Hawaiians, at the same time Congress would reject such Native Hawaiian preferences through § 1981. Moreover, by reenacting § 1981 in the midst of passing other legislation to provide specifically and particularly for the education of Native Hawaiians, Congress signaled its clear support for the Kamehameha Schools and for the validity of the Schools’ admissions policy.
Accordingly, the most plausible reading of § 1981, in light of the Hawkins-Stafford Amendments and the NHEA, is that Congress intended that a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy’s ancestral lands, be upheld because it furthers the urgent need for better education of Native Hawaiians, which Congress has repeatedly identified as necessary.
CONCLUSION
King Kamehameha I, on his death bed, is reported to have said, “Tell my people I have planted in the soil of our land the roots of a plan for their happiness.” Princess Pauahi Bishop and Her Legacy at 122. His great granddaughter, Princess Bernice Pauahi Bishop, echoed that sentiment when she established, through her will, the Kamehameha Schools. Because the Schools are a wholly private K-12 educational establishment, whose preferential admissions policy is designed to counteract the significant, current educational deficits of Native Hawaiian children in Hawaii, and because in 1991 Congress clearly intended § 1981 to exist in harmony with its other legislation providing specially for the education of Native Hawaiians, we must conclude that the admissions policy is valid under 42 U.S.C. § 1981.
AFFIRMED.

. Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, 416 F.3d 1025 (9th Cir.2005), reh'g en banc granted, 441 F.3d 1029 (9th Cir.2006).

. This general information simply sets the stage for our more particular consideration of the educational status of Native Hawaiian children.

. The Pauahi Bishop Will established two separate schools, one for boys and one for girls. The boys' school opened in 1887 and the girls' school in 1894. During the 1965-1966 school year, the two schools were consolidated.

. Disparities abound outside of the educational context as well. Today among the major ethnic groups in Hawaii, Native Hawaiians have the highest rates of unemployment, Ka Huakai at 84, and poverty, id. at 86-87, and the lowest mean family income, id. at 85-86. They live in the poorest geographic areas and are underrepresented in managerial and professional occupations. Id. at 8. Native Hawaiians suffer from greater health risks than other ethnic groups on the islands, with the lowest life expectancy and highest mortality rates from cancer, heart disease, and diabetes. Id. at 93. Although Native Hawaiians account for approximately 20% of the state’s population, they account for more than half of all teenage pregnancies, id. at 203, and more than 44% of child abuse and neglect cases in the state, id. at 206. Native Hawaiians are more likely to be arrested for violent crimes than any other ethnic group in the state. Id. at 76-77.

. Plaintiff now seeks only damages because he is no longer a high school student. This case is not moot, however, because if the Kamehameha Schools’ admissions policy were unlawful, Plaintiff has a possible claim for money damages.

. The panel's decision generated strong public opposition. Eleven amicus briefs were filed by diverse political and social interests in Hawaii supporting rehearing en banc. These amicus briefs were filed by: (1) the State of Hawaii; (2) the entire Hawaiian congressional delegation; (3) the Mayor of the City and County of Honolulu, and the City and County of Honolulu; (4) the Hawaii Business Roundtable, the Hawaii Korean Chamber of Commerce, the Public Schools of Hawaii Foundation, and the Hawaii Association of Independent Schools; (5) the National Association of Independent Schools; (6) the Parent-Teacher Association of Kamehameha Schools, and the Alumni Association of Kamehameha Schools; (7) the Native Hawaiian Legal Corporation, the Native Hawaiian Bar Association, and Na'A'ahuhiwa; (8) various Hawaiian service organizations; (9) 'Ilio'ulaokalani Coalition, an organization of Hawaiian master teachers and cultural experts; (10) the Japanese American Citizens League of Hawaii-Honolulu Chapter and other civic groups; and (11) the National Indian Education Association and the Alaskan Federation of Natives. Additionally, the current governor of Hawaii and a prominent former governor both submitted declarations to the district court on the importance of maintaining the Kamehameha Schools' admissions policy. Doe, 295 F.Supp.2d at 1169, 1171; see also Recent Case, Civil Rights—Section 1981—Ninth Circuit Holds that Private School's Remedial Admissions Policy Violates § 1981—Doe v. Kamehameha Schools, 416 F.3d 1025 (9th Cir.2005), 119 Harv. L.Rev. 661, 668 (2005) (concluding that a traditional Title VII approach is not appropriate in the private school context). *837 v. Cayetano, 528 U.S. 495, 514, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (so holding in the context of a voting rights case).

. Section 1 of the Civil Rights Act of 1866 provided:
*836 That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntaxy servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.
14 Stat. at 27.

. In pertinent part, section 16 of the Enforcement Act of 1870 provides:
Arxd it be further enacted, That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding.
16 Stat. at 144.

. The Kamchameha Schools are non-profit, rather than commercial. But, because the schools charge tuition (albeit at a rate that represents only a fraction of the cost to educate students), the bargained-for exchange of payments for instruction exists here, as it did in Runyon. We need not and do not decide whether § 1981 would apply if the Schools charged no tuition at all, but simply donated education to Native Hawaiian students. *837 In addition, for the purposes of our decision, we accept that "Native Hawaiian” — like "Negro” — is a racial classification. See Rice

. One student without Native Hawaiian ancestry has been admitted to the Schools in recent years because, for one class, the available seats out-numbered the applicants with Native Hawaiian ancestry. See Timothy Hurley & Walker Wright, Kamehameha Schools admits non-Hawaiian, Honolulu Advertiser, July 12, 2002.

. According to the record, as we have noted, the Kamehameha Schools currently receive no money from Congress.